UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE GEORGE WASHINGTON UNIVERSITY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE DISTRICT OF COLUMBIA, *et al.*, | ) ) ) |
| Defendants. | ) ) ) ) |

Civil Action No. 01-0895 (LFO)

MEMORANDUM

This case involves constitutional challenges to various conditions imposed by the District of Columbia's Board of Zoning Adjustment ("the Board") on the development of George Washington University's campus in the District's Foggy Bottom and West End neighborhoods ("Foggy Bottom"). Currently pending is defendants'[1] motion for summary judgment on four of the University' claims: unconstitutional taking/unconstitutional conditions (Claims I and II); denial of equal protection (Claim VI); and violation of the University students' right to equal protection and due process (Claim VIII). As explained below, the D.C. Circuit's opinion requires that defendants' motion should be granted on all four counts.

**I.      Procedural History**

Pursuant to D.C. zoning laws, in 1999 the University submitted to the Board for its review and approval a "campus plan" for the years 2000-2010. The Board approved the plan, but issued

---

[1] Defendants in this case are the District of Columbia, the District of Columbia Board of Zoning Adjustment, Anthony Williams, Geoffrey Griffis, Anne Renshaw, David Levy, and Carol Mitten.

Case 1:01-cv-00895-LFO   Document 139   Filed 09/16/05   Page 2 of 11

an Order ("Initial Order") imposing several conditions, including particularly Condition 9. This condition imposed a cap on student enrollment to the number admitted as of February 13, 2001, and it imposed this cap after the University had already admitted a substantial number of its students for the immediately forthcoming semester. See George Washington Univ. v. District of Columbia, et al., 148 F. Supp. 2d 15, 16 (D.D.C. 2001). The Initial Order also imposed a sanction on the University if it failed to meet its requirement to house 70% of its students on-campus, by barring the University from building any non-residential buildings on campus while out of compliance. Id. at 18. The University filed suit, seeking to enjoin enforcement of the Initial Order.

On June 15, 2001, I granted the University's motion for a preliminary injunction, finding that the University was substantially likely to succeed in demonstrating that Condition 9 of the Initial Order was so arbitrary and capricious as to violate the University's right to substantive due process. Id. at 17.[2]

On January 23, 2002, the Board issued its corrected Final Order, which differed in some respects from the Initial Order. Whereas the Initial Order required the University to house 70% of its undergraduates and capped student enrollment to the number enrolled as of February 13, 2001, the Final Order imposed a "soft cap" of housing 5,600 (or 70%) of its 8,000 undergraduates, and additionally required the University to house every undergraduate above the 8,000 threshold either

---

[2]A condition of the preliminary injunction order required the University to seek equitable relief in local courts. Id. at 19. The University did so, and the D.C. Court of Appeals remanded the matter to the Board.

on campus or outside Foggy Bottom.[3]  The Final Order also provided a six-month grace period for the University to comply.  In addition, it allowed the University to house the students either on-campus or outside of Foggy Bottom until August 2006.  Thereafter, it was required to use only on-campus housing.

After the Board issued its Final Order, the University amended and supplemented its complaint.  The parties then cross-moved for summary judgment on all claims, including particularly Claims III (substantive due process) and XII (substantive due process and separation of powers).  An April 12, 2002 Order granted summary judgment in favor of the University on Claims III and XII – concluding that the Board Order violated the University's due process rights on the theory that, while the government's purpose was legitimate, the government's regulations were not rationally related to its legitimate purpose.  George Washington Univ. v. District of Columbia, 2002 U.S. Dist. LEXIS 26729, at *17-18, 26-27 (D.D.C. 2002);[4] see id. at *24 ("'the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'") (quoting County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)) (emphasis added)

---

[3]For example, if the University enrolled 8,100 students, then it would be required to house 5,600 + (8,100 - 8,000) = 5,700 students.

[4]The April 2002 Order also denied defendants' motion for summary judgment on Claim XI (without prejudice) and Claim XIII (with prejudice), but granted defendants' motion for summary judgment on Claims VII, IX, and X.  I expressly declined to rule on the remaining claims (Claims I, II, V, VI, and VIII), including particularly the University's takings claims, by denying cross motions for summary judgment, because I found the challenged provision (Condition 9) unconstitutional on other grounds.  Id. at *23.  The Order also denied cross motions for summary judgment on Claim IV.

(internal quotations omitted); id. ("legislative acts violate the guarantee of substantive due process if they are 'arbitrary and irrational,' without more.") (quoting, inter alia, Eastern Enters. v. Apfel, 524 U.S. 498, 537 (1998)).  Both parties appealed.

**II.     The D.C. Circuit's Opinion**

The court of appeals affirmed in part and reversed in part, and held that the Final Order was not unconstitutional in all respects.  George Washington Univ. v. District of Columbia, 318 F.3d 203 (D.C. Cir. 2003).  Although the court's decision did not directly address the remaining claims specified above (Claims I, II, VI, and VIII) (see supra slip op. at 1), the clear implication of the court's ruling is that the University's remaining claims cannot succeed.

In its ruling, the court noted that the Final Order found that the property purchased by the University in the Foggy Bottom neighborhood for undergraduate housing, and undergraduates' "informal" off-campus housing, "threatened the 'livability and residential character' of the Foggy Bottom neighborhood."  Id. at 206.  The court concluded that "on average [students] pose a risk of behavior different from that generally preferred by non-student residents and legally relevant."  Id. at 209.

The University argued that the on-campus or outside Foggy Bottom housing requirements rendered the University's off-campus student housing in Foggy Bottom "duplicative," which was plainly irrational.  The court disagreed, concluding that "nothing in the transitional housing plan forces the University to give up its off-campus Foggy Bottom dorms or prevents it from continuing to house students there.  If it chooses, it can continue supplying that housing in addition to the 5600 beds required by Conditions 9(a)-(c)."  Id. at 210 (emphasis in original).

The court then turned to Condition 9(e) of the Final Order, which prohibited "the issuance

of any new 'permit to construct or occupy buildings for nonresidential use on campus' whenever 'a semiannual report reveals that [the University] is not in compliance' with the conditions of [the Final] Order." Id. at 211.  The court held – without extensive discussion – that this condition "clearly serves two important functions that advance the District's goals."  Id.  This condition "strengthens the University's incentive to comply with the housing provisions" and it generally "keeps housing and non-housing growth proceeding in parallel."  Id.

The court also held that Condition 10 – which required freshmen and sophomores to live on campus "to the extent such housing is available" – was not problematic, in part because the University proposed it as part of its own plan (although it was tied to another proposal that the Board rejected).  Id.  Morever, "the condition seems readily to meet the latitudinarian standards of substantive due process.  A city might reasonably consider the youngest college students to be the ones most likely to disturb residents in the surrounding communities, as well as most likely to need whatever shreds of parietal rules may subsist on campus."  Id.

Finally, the court affirmed that the District's zoning regulations were not unconstitutional as violative of the equal protection element of Fifth Amendment due process rights.  Because universities are not a protected class, the legislation need only "classify the persons it affects in a manner rationally related to legitimate governmental objectives."  Id. at 212 (citation and internal quotations omitted).  The court found that the regulations meet this standard:  "As universities are larger, make more intensive use of their land, and have greater spillover effects on neighboring communities than most other landowners . . . , the District's legislative classifications meet this criterion."  Id.

**III.     The University's Takings Claims** (Claims I and II)

In its amended complaint, the University alleged that the Board's Final Order effects an unconstitutional taking of (1) its properties that cannot be used for non-residential purposes (assuming the University is not in compliance with the Final Order); (2) its off-campus housing, which cannot be counted in determining whether the University is complying with the Final Order; 3) its financial resources, which will be expended to build on-campus housing; and 4) tuition revenue, which will be limited by the *de facto* cap on undergraduate enrollment. The University's takings claims were not reached in this court or on appeal, because the case was disposed of on due process grounds. None of these claims has merit, however; in fact, they appear to be largely a restatement of the University's due process and equal protection claims.

Takings claims in the D.C. Circuit are governed by District Intown Prop. Ltd. P'ship, et al. v. District of Columbia, 198 F.3d 874 (D.C. Cir. 1999), affirming 23 F. Supp 2d 30 (D.D.C. 1998). There are two types of takings claims – a per se taking, and a taking based on a three-part balancing test. Under either test, the relevant inquiry is an economic assessment of the entire property, and not just the parcels of land that a party claims have lost value. See id. at 880 ("the District Court correctly determined that all nine lots should be treated as one parcel for the purpose of the court's taking analysis.").

   A.     *Per Se* Taking

A per se taking occurs either if governmental regulations result in "'permanent physical occupation of property,'" or alternatively leads to a loss of "all economically beneficial or productive use of property." Id. at 879 (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-35 (1982) and Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015

(1992) (emphasis in original)). The Board's Final Order does not result in a physical occupation of property, nor does it lead to a loss of "all economically beneficial or productive use of property." Id. At worst, the Final Order requires the University to use its property for a certain purpose, but these requirements do not deprive the University of all economic benefit of the property.

      B.    *Penn Central* Taking

In determining if there is a taking under the balancing test, there are "three primary factors weighing in the balance: the regulation's economic impact on the claimant, the regulation's interference with the claimant's reasonable investment-backed expectations, and the character of the government action." Id. at 879 (citing Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978)). The parties disagree about whether a claimant must meet all three Penn Central elements, or if these are simply three factors to balance. Under either approach, however, the claims of the University fail.

      **1.**    **Economic Impact**

Claimants "'must put forth striking evidence of economic effects to prevail even under the [balancing] inquiry.' See Penn Central Transp. Co., 438 U.S. at 131 (reviewing the Court's decisions upholding regulations despite diminution in a property's value of more than 75%)." Id. at 883. The University, however, makes no showing that the Final Order diminishes the property's value. Instead, the University alleges that the District has restricted the use of the University's property – without tying these restrictions to an actual economic loss of property value. See Plaintiff's Amended and Supplemental Complaint ("Compl.") ¶¶ 48-59.

At most, the University alleges that it will cost money to comply. Id. ¶ 56. This is not,

however, a substantial loss of property value. For example, the University argues that the Final Order "deprives the University of the existing use of its off-campus properties in Foggy Bottom that were developed by right for student housing." Id. ¶ 58. As the D.C. Circuit noted, however, the University can still use the off-campus housing; it simply cannot count this housing towards its 70% requirement. See George Washington, 318 F.3d at 210.

### 2. Investment-Backed Expectations

There is no interference with the University's investment-backed expectations here, because it was on notice that its property was subject to governmental regulation. See George Washington, 318 F.3d at 205 (describing how the University had land classified as "special purpose," which required the Board's pre-approval of the University's "campus plan"). Moreover, the Board expressed concern in 1985 about the University's growth, and – following its decision to undergo a "sharp expansion" in enrollment in the late 1990s – the University should have anticipated that further regulation might be imminent. Id. at 206; see District Intown, 198 F.3d at 883 ("Lucas teaches that a buyer's reasonable expectations must be put in the context of the underlying regulatory regime") (citing Lucas, 505 U.S. at 1030); id. at 884 ("Businesses that operate in an industry with a history of regulation have no reasonable expectation that regulation will not be strengthened to achieve established legislative ends.") (citing Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 645 (1993)).

### 3. Character of the Government's Action

To assess the character of the government's action, the central question is whether the regulation advances a "common good" or "public purpose." See District Intown, 23 F. Supp. 2d at 37 (citing, inter alia,  Penn Central, 438 U.S. at 124, and Keystone Biuminous Coal Ass'n v.

DeBenedictis, 480 U.S. 470, 485-93 (1987)).  The D.C. Circuit has already concluded here that the regulations were rationally related to a legitimate government objective, in light of a university's potential impact on the surrounding neighborhood.  George Washington, 318 F.3d at 212.  This ruling that the regulations and Order are rationally related to a legitimate government objective suffices to establish that they are in furtherance of a common good or public purpose. See, e.g., Kelo v. City of New London, __ U.S. __, 125 S. Ct. 2655, 2667 (2005) ("When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings . . . are not to be carried out in the federal courts.") (citations and internal quotations omitted).

IV.     **Equal Protection** (Claim VI)[5]

Claim VI alleges that the Final Order imposes greater restrictions on the University's ability to use its property than imposed on others similarly situated, thereby denying equal protection as guaranteed by the Fifth Amendment.  See Compl. ¶ 86-87.  The D.C. Circuit has already indicated, however, that the Final Order is rationally related to a legitimate government objective.  George Washington, 318 F.3d at 210.  Although this finding was in the context of analyzing the due process claim (and not equal protection), in practice these tests are almost indistinguishable.  See George Washington, 2002 U.S. Dist. LEXIS 26729, at *17, *24 (applying rational basis test for equal protection and substantive due process claims).

V.      **Due Process and Equal Protection Rights of the University Students** (Claim VIII)

Finally, the University claims that the Final Order violates the University students' due

---

[5]In discussing the University's due process and equal protection claims, the parties address extensively claim preclusion and issue preclusion.  It is not necessary to address either of these issues in order to decide this case.

process and equal protection rights by forcing them to live on campus and not in the University's off-campus dorms in Foggy Bottom.

  A.  <u>Standing</u>

Defendants first challenge this claim on the ground that the University lacks standing to represent the students. <u>See</u> Defs' Mot. for Summ. J., at 15-17. Resolution of the standing issue is a close call, but, because the underlying claims fail, there is no need to reach this issue.

  B.  <u>Constitutional Claims</u>

The University's arguments on behalf of its students are largely duplicative of its constitutional arguments on its own behalf. The University alleges that the Final Order discriminates against its students by dictating where they can live. On this theory, the University alleges both due process and equal protection violations. <u>See</u> Compl. ¶ 98.

As previously discussed, for both the equal protection and substantive due process claims, the Court of Appeals has already held that the Final Order was rationally related to a legitimate government objective. The court found that the University provided no grounds "for even doubting the implicit basis for the Board's distinction of students from others -- namely, that on average they pose a risk of behavior different from that generally preferred by non-student residents and legally relevant." <u>George Washington</u>, 318 F.3d at 209. Moreover, it has decided that the means employed by the University are rationally related to its ends. <u>Id.</u> at 210-11. For the substantive due process claim, it similarly rejected any claim that the Final Order was motivated by group animus towards the University's students. <u>Id.</u> at 209. In sum, it has already considered and upheld the Board's Final Order in full. The University makes no showing as to why claims on behalf of the students compel a different conclusion.

\* \* \*

Accordingly, the Court of Appeals leaves no alternative but to dismiss the University's complaint, and leaves it with no further recourse beyond seeking relief by further appeal, or by legislation.

An Order granting defendants' Motion for Summary Judgment accompanies this memorandum.

/s/

Louis F. Oberdorfer

DATE: September 16, 2005            UNITED STATES DISTRICT JUDGE